IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
December 12, 2001 Session

**STATE OF TENNESSEE v. ROBERT CARL HARBISON, JR.**

**Direct Appeal from the Circuit Court for Maury County**
**No. 11567     Robert L. Jones, Judge**

_____

**No. M2001-00421-CCA-R3-CD  - Filed April 26, 2002**

_____

The defendant was convicted of reckless aggravated assault and sentenced as a Standard Range I offender to two (2) years, with all but ten (10) days suspended.  Viewing the evidence in the light most favorable to the State, we conclude there is sufficient evidence to support the jury's finding that the defendant acted recklessly in causing serious bodily injury to the victim.  However, applying the appropriate factors for consideration, we conclude that the defendant is eligible for judicial diversion, and there is no substantial evidence to support the trial court's denial of the defendant's request for judicial diversion.  Accordingly, the judgment of the trial court is affirmed in part and reversed  and remanded in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part; Reversed and Remanded in Part**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JOE G. RILEY and JAMES CURWOOD WITT, JR., JJ., joined.

Eric L. Davis, Franklin, Tennessee, for the appellant, Robert C. Harbison, Jr.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; and T. Michel Bottoms, District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The defendant, Robert C. Harbison, Jr., was indicted for aggravated assault in violation of Tennessee Code Annotated section 39-13-102.  He was tried by a jury and convicted of reckless aggravated assault in violation of Tennessee Code Annotated section 39-13-102(a)(2)(A), a Class D felony.  He was sentenced as a Range I Standard offender to two (2) years, with all but ten days suspended.  The defendant was placed on supervised probation for two years and ordered to pay $2200.00 restitution in addition to court costs.  The defendant filed a timely motion for new trial, which was denied by the trial court.  In this appeal, the defendant alleges that there is insufficient evidence to support his conviction; that the trial court erred by

denying his request for judicial diversion; and that the trial court erred by sentencing the defendant as a Standard Range I offender rather than as an especially mitigated offender.

## FACTS

The victim, Jeff Dodson, and his wife, Kim Dodson, lived across the street from Donna Johnson, the co-defendant. At the time of the instant offense, Ms. Johnson was in the process of divorcing Kim Dodson's brother and was involved in a romantic relationship with the defendant. The testimony at trial and sentencing revealed that the Johnsons' divorce proceedings lasted almost a year and that there was a great deal of animosity between Ms. Johnson and the Dodson's, which stemmed from the divorce. According to both Ms. Johnson's and the victim's testimony, the victim, his wife, and his father-in-law all testified at the Johnsons' divorce hearing. In addition, fourteen audiotapes of Ms. Johnson's telephone conversations with various people were introduced into evidence at the divorce proceedings. The conversations were apparently intercepted with a police scanner while Ms. Johnson was using her cordless telephone and were recorded without Ms. Johnson's permission. On the day of the instant offense, the victim and his wife were admittedly attempting to photograph Ms. Johnson with the defendant. From the record, it appears that a few days before the incident, Ms. Johnson and her estranged husband entered an agreed order prohibiting Ms. Johnson from seeing the defendant while her divorce was pending. The victim, the defendant, and Ms. Johnson all testified at the trial. The victim's description of the events differed from that of the defendant and Ms. Johnson.

The victim testified that on the evening of June 19, 1999, he and his wife drove to Spring Hill, Tennessee, where they decided to drive by the defendant's residence on Wilkes Lane to see if Ms. Johnson's Suburban automobile was parked outside the defendant's trailer. According to the victim, they planned to take a photograph of the Suburban to prove that Ms. Johnson was violating the court order prohibiting her from having contact with the defendant. However, they did not find Ms. Johnson's truck at the defendant's residence so they decided to drive to Columbia to get something to eat. As they were driving towards Columbia, the victim saw a Suburban resembling Ms. Johnson's parked at the Parkway Lanes bowling alley. He decided to stop and go inside the bowling alley to see if Ms. Johnson was inside with the defendant. The victim brought his camera inside and planned to take Ms. Johnson's photograph if he found her with the defendant. Immediately upon entering the establishment, Ms. Johnson apparently saw the victim, ran towards him, leaped on top of him, and grabbed his camera. The victim "pushed her off" and attempted to leave. However, Ms. Johnson called out to the defendant for assistance.

The defendant walked over and he and the victim began struggling for possession of the camera. According to the victim, the defendant took the camera and tossed it to Ms. Johnson. The victim then punched the defendant in the head and the two men began fighting. They eventually fought their way through a set of double glass doors and into the foyer of the bowling alley. The foyer contained a set of double glass doors leading outside the bowling alley and another set leading into the bowling alley. There was also a pane glass window on each side of the double glass doors. While the victim and the defendant were in the foyer, Ms. Johnson jumped on the victim's back and began clawing him. Then, according to the victim, Ms.

Johnson and the defendant simultaneously pushed him backwards through one of the pane glass windows, and he landed outside on the sidewalk. As a result, his leg was cut to the bone. The victim was taken by ambulance to the Maury Regional Hospital where immediate surgery was performed. He suffered permanent nerve damage to his leg, missed six (6) weeks of work, wore a boot cast, and underwent six (6) weeks of physical therapy.

On cross-examination, the victim acknowledged that he and the defendant were involved in a mutual fistfight where each individual was struck a number of times. The victim denied that both he and the defendant fell through the glass window. When questioned about whether he listened to Ms. Johnson's telephone conversations on the day of the incident, the victim admitted that he had a scanner in his home but denied that he and his wife listened to Ms. Johnson's telephone calls on that day. He further denied any knowledge of the contents or origin of the audiotapes of Ms. Johnson's telephone conversations that were admitted into evidence at Ms. Johnson's divorce hearing. However, the victim admitted that he had twice testified, and that his wife and father-in-law had also testified in Ms. Johnson's divorce case. The victim maintained that he and his wife went for a ride to College Grove, Tennessee, on the evening in question, happened to have a camera with them, and spontaneously decided to drive to the defendant's house in Spring Hill. After determining that Ms. Johnson's automobile was not at the defendant's home, the victim coincidentally decided to drive to the Columbia Krystal restaurant for dinner. The victim persisted that he coincidentally saw Ms. Johnson's automobile at the bowling alley and entered to take a photograph.

Richard McCrary testified that he was present at Parkway Lanes on June 19, 1999, and that he saw the victim enter the bowling alley with a camera in his hand. He heard Ms. Johnson yell, and observed her attempting to take the camera from the victim and then falling down. Mr. McCrary stated that he saw the defendant grab the victim, and the two men began scuffling. According to Mr. McCrary, Ms. Johnson also hit the victim. He testified that the defendant pushed the victim, and both men went through the glass windowpane. Mr. McCrary observed that the victim's leg was cut very badly and that the bone was visible. Mr. McCrary did not remember seeing any children involved in the altercation. He did not know the defendant or the victim and did not give a statement to police on the date of the incident. Mr. McCrary testified that he did not give a statement to anyone until over a year after the incident, when he was approached by someone from the district attorney's office a week before the trial.

The defendant testified that he and Ms. Johnson were dating on June 19, 1999, and that Ms. Johnson and the defendant's son had made plans over the telephone to go bowling that evening to celebrate Ms. Johnson's twins' recent birthday. The defendant telephoned Ms. Johnson when he got off work, and they arranged to dine at the Krystal restaurant in Columbia and then to go bowling. The defendant, Ms. Johnson, the defendant's twelve-year-old son Jonathan, Ms. Johnson's twelve-year-old son Hank, and Ms. Johnson's eleven-year-old twins Casey and Jesse traveled in Ms. Johnson's Suburban automobile.

The defendant was watching the children bowl when he heard Ms. Johnson say, "Carl, Carl," and as he turned, he saw her "flying through the air." The defendant then saw the victim, whom he had never seen before, and was confused as to whether the victim was stealing Ms.

Johnson's pocketbook. The defendant quickly realized that the victim was taking photographs, approached the victim, and struggled for possession of the camera. During the struggle, the camera fell on the floor. The victim struck the first blow by hitting the defendant on the head, and the two men began fighting. According to the defendant, it was the victim who pushed the defendant through the glass window, causing the defendant to land on his back on the sidewalk. The defendant explained that the victim came through the glass on top of him, and he kicked the victim off of him and back through the glass panel. The defendant stated he then re-entered the foyer, scuffled with the victim, and grasped him in a headlock. The defendant also stated that his son, Jonathan, and Ms. Johnson's son, Jesse, came to his aid by kicking and hitting the victim until Ms. Johnson intervened and extricated the children from the altercation. The defendant testified that Ms. Johnson never joined in the brawl.

The defendant reiterated that he had previously never seen the victim, had never spoken to him or had cross words with him, and did not have any problem with him. The defendant explained that only three or four seconds elapsed from the time he first thought the victim was assailing Ms. Johnson to the time he grappled with the victim. The defendant testified that he initially approached the victim because he "didn't know what was going on." The defendant agreed with the victim that the victim hit him first and that they were "basically wrapped together" until the altercation was concluded. However, the defendant explained that he did not believe the victim intended to push him through the window, but, rather, it was a "push/tug situation" and that he went through the window first. The defendant sustained cuts to his elbow, back, shoulder, and knee.

On cross-examination, the defendant acknowledged that Ms. Johnson was prohibited from seeing him as a result of a Williamson County court order. The defendant also conceded that by the time he reached the victim, he realized that the victim was not trying to take Ms. Johnson's purse.

Jonathan Harbison, the defendant's thirteen-year-old son, testified that he saw a man walk into the bowling alley carrying a camera. Thereafter, he heard Ms. Johnson yell, "Get the camera." She ran over to the man and attempted to grab the camera. He saw Ms. Johnson fall to the floor but was not certain if Ms. Johnson was thrown down or if she tripped and fell. Jonathan testified that the defendant ran over and began scuffling with the man, and the two men went through the glass window. He stated that the two men ended up back inside the bowling alley and "slid down the wall." Jonathan testified that the defendant went through the glass first and then kicked the victim back inside. He stated that he and Ms. Johnson's son, Jesse, also joined in the fight by hitting and kicking the victim. He also indicated that Ms. Johnson was not involved in the fight but tried to pull the two boys away from the fight. He observed that the defendant sustained a couple of cuts on his knee and elbow as a result of the fight.

Jesse Johnson, Ms. Johnson's eleven-year-old son, testified that the victim and his wife walked into the bowling alley and began taking pictures. His mother attempted to grab the camera, and the victim threw her down. Jesse stated that the defendant and the victim began fighting. Jesse also admitted that he kicked the victim. He testified that both men went through a glass window, and the victim cut his leg. Jesse did not know who went through the glass first.

Ms. Johnson's twelve-year-old son, Hank Johnson, testified that he also saw the defendant and the victim fighting in the bowling alley. However, he did not see who went through the glass window. Ms. Johnson's eleven-year-old daughter, Casey Johnson, testified that she recalled seeing a flash and her mother attempting to grab a camera from the victim. She thought the victim might have pushed her. Casey then saw the defendant and the victim fighting. She testified she did not see them go through the glass window, but saw the broken glass and was aware the victim's leg was cut. The defendant also had a couple of scratches.

Ms. Johnson, who was a co-defendant in the instant case, testified that on June 19, 1999, around 11:00 a.m. or 12:00 p.m., she spoke with the defendant's son, Jonathan, on her cordless telephone, and they discussed going bowling later that evening. Later that afternoon, Ms. Johnson sat on the front porch and discussed the plans with the defendant over the telephone. While she was talking to the defendant, the victim was outside his residence shooting guns. Ms. Johnson testified that during her divorce proceedings, audiotapes of her telephone conversations with the defendant and others were introduced.

Later that evening, Ms. Johnson and her children met the defendant and Jonathan at his residence. They drove her Suburban to the Krystal restaurant in Columbia and then drove to Parkway Lanes Bowling Alley. Ms. Johnson testified that she and the defendant were watching the children bowl when she saw a flash. She turned around and saw the victim with a camera. She walked up to the victim and tried to take the camera from him. The victim threw her down on the floor, and she received a carpet burn on her knee. She yelled to the defendant, and he walked over and began struggling with the victim for possession of the camera. The victim hit the defendant on the head, and the two men began fighting. They struggled with one another into the foyer. Ms. Johnson testified that the defendant and the victim both went through a glass window in the foyer, and the defendant kicked the victim back inside the foyer. She testified that she did not strike the victim but indicated that Jonathan and Jesse had joined in the fight, and that she tried to pull them away.

On cross-examination, Ms. Johnson admitted that she had entered an agreed order prohibiting her from being around the defendant. She stated that the order was entered on June 15. However, it had not yet been filed at the time of the incident at the bowling alley. According to Ms. Johnson, she was around the defendant one time after the order was entered and that was at the bowling alley. She also verified that the defendant did not know the victim prior to the altercation at the bowling alley.

## ANALYSIS

The defendant alleges that there is insufficient evidence to support his conviction for reckless aggravated assault; that the trial court erred by denying his request for judicial diversion; and that the trial court should have sentenced the defendant to full probation as an especially mitigated offender.

I. Sufficiency of Evidence

The defendant asserts that the evidence at trial was insufficient to support his conviction for reckless aggravated assault. Specifically, he argues that no rational trier of fact could have found the *mens rea* element of reckless. We disagree. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence.

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the prevailing party the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. State v. Tuggle, 639 6S.W.2d 913, 914 (Tenn. 1982). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

The defendant was convicted of reckless aggravated assault. A person commits reckless aggravated assault who recklessly commits an assault and causes serious bodily injury. Tenn. Code Ann. §§ 39-13-101(a)(1), -102(a)(2)(A). In order for conduct to be considered reckless, it must be shown that a person "acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." Tenn. Code Ann. § 39-11-302(c). Disregard of this risk must constitute a gross deviation from the standard of care that an ordinary person would exercise. Id. "Serious bodily injury" is defined as bodily injury which involves: (A) a substantial risk of death; (B) protracted unconsciousness; (C) extreme physical pain; (D) protracted or obvious disfigurement; or (E) protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty. Tenn. Code Ann. § 39-11-106(a)(34).

There is sufficient evidence from which a jury could conclude that the defendant was guilty of reckless aggravated assault. The testimony of the victim supports the finding by the jury that he suffered serious bodily injury. In addition, the jury specifically found that the defendant acted recklessly rather than knowingly or intentionally and thus convicted the defendant of a Class D reckless aggravated assault rather than a Class C knowing or intentional

aggravated assault. While we agree with the defendant that the uncontroverted evidence established that the victim and the defendant were mutually engaged in a physical altercation, it was within the jury's discretion to find that the defendant's pushing or kicking of the victim near a glass window pane was reckless conduct. According to the defendant's version of the events, he kicked the victim back through the broken window. Therefore, his conduct admittedly caused the victim's serious injury. Although the defendant did not intend to cause serious injury to the victim, his conduct could reasonably be viewed as reckless. The defendant seems to be arguing that because the victim was also engaging in reckless conduct, the defendant cannot be held accountable for causing serious bodily injury to the victim. However, regardless of the victim's equally reckless conduct, the evidence established that the defendant engaged in reckless conduct, i.e. fighting near a pane glass window, and such reckless conduct caused serious bodily injury to the victim. The jury was instructed on the issue of self-defense and defense of a third person and obviously rejected those theories. This issue is without merit.

## II. Judicial Diversion

The defendant next asserts that the trial court erroneously denied his request for judicial diversion. Judicial diversion allows a defendant who meets certain eligibility criteria to be placed on probation and subsequently have the charges dismissed, if the probationary period is completed successfully. Tenn. Code Ann. § 40-35-313. Tennessee Code Annotated section 40-35-313(a)(1)(A) provides that a defendant is eligible for judicial diversion if he or she (a) "is found guilty or pleads guilty to . . . a Class C, D or E felony," (b) has not previously been convicted of a felony, and (c) consents to the deferment of proceedings and placement on probation "for a period of time . . . not more than the period of the maximum sentence of the felony with which the person is charged." This Court has consistently recognized that

> [t]he fact that an accused meets these prerequisites does not entitle the accused to judicial diversion as a matter of right. The statute states that a trial court "may" grant judicial diversion in appropriate cases . . . . Thus, whether an accused should be granted judicial diversion is a question which addresses itself to the sound discretion of the trial court. This Court, . . . will not interfere with the refusal of the trial court to grant judicial diversion if there is "any substantial evidence to support the refusal" contained in the record.

State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993) (quoting State v. Oscar Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992)).

In reviewing the decision of a trial court to grant or deny judicial diversion, this Court applies an abuse of discretion standard. Bonestel, 871 S.W.2d at 168; Anderson, 857 S.W.2d at 572. In determining whether an accused should be granted judicial diversion, the trial court should consider the defendant's criminal record, social history, mental and physical condition, and amenability to correction; as well as the circumstances of the offense, the deterrent effect of punishment upon other criminal activity, and the likelihood that pretrial diversion will serve the ends of justice and best interests of both the public and the defendant. Bonestel, 871 S.W.2d at 168. If, after assessing all relevant factors, the trial court chooses to deny judicial diversion, the

court must articulate on the record both the specific reasons supporting the denial and why those factors applicable to the denial of diversion outweigh the other factors for consideration. Id.

In the instant case, the trial court found that the defendant "didn't use a weapon." While acknowledging that the defendant "got into a fight he shouldn't have gotten into," the trial court pointed out that "there were two men engaged in this fight, and either one of them could have had their leg cut by this window." The trial court also found that the circumstances of the offense were so unusual as to be unlikely to be repeated. In addition, the trial court found that the defendant had six years of regular employment prior to his conviction. Finally, the trial court recognized that defendant "was committing adultery, and that's maybe an immoral act but it was not an illegal act. It wasn't even in violation of the Williamson County [divorce] court order."

> After making the foregoing findings, the trial court expressed concern
>> that there had been a jury trial; that there has been considerable application of State resources through the District Attorney's office and the judicial department of the State; a number of people inconvenienced during jury selection, and the remaining jurors actually selected missed work that day, and employers and others were inconvenienced.

The trial court went on to deny the defendant's request for judicial diversion stating that the defendant's conduct at the bowling center, "and his continued involvement with Miss Johnson, while these court orders were in effect and while she was a married woman, suggests that he is not that ideal good citizen . . . ." The trial court added

>> I think the Court will grant [judicial diversion] some day, and maybe grant it even on a crime involving violence, when the Court finds that the victim was sufficiently involved in the provocation as existed in this case.

>> And I do regret that [the defendant] may lose his long-term employment with the Williamson County Schools, because of this. At the same time, he may be able to appeal, and get this Court's judgment reversed, as to this Court's denial of diversion, or even the denial of the judgment of acquittal.

We first note that it appears from the record that in denying judicial diversion, the trial court placed great weight on the fact that there had been a jury trial. However, any consideration of the fact that there had been a jury trial was erroneous because Tennessee Code Annotated section 40-35-313(a)(1)(A) clearly allows judicial diversion for an eligible defendant "who is found guilty or pleads guilty." Although we acknowledge the trial court's obvious struggle to reach the correct decision, our review of the record reveals no substantial evidence to support the denial of judicial diversion. The defendant has no criminal record. He is the divorced father of four children and pays $698.25 a month for child support. The defendant does not use alcohol or drugs and is in good physical condition. The defendant has been employed as a school bus driver for six years and also owns a tree service. The defendant provides his children with health insurance through his employment as a bus driver. All of these factors weigh in favor of granting judicial diversion. State v. Lewis, 978 S.W.2d 558, 566-67 (Tenn. Crim. App. 1997).

With respect to the circumstances of the offense, the record reveals that the offense did not involve a weapon and that the victim provoked the defendant by striking him first. Additionally, the trial court found that the victim and defendant were engaged in a mutual physical altercation when the injury occurred and that either man could have been cut by the broken glass. With respect to the deterrent effect, the offense did not involve an intentional or knowing act, but rather involved reckless conduct occurring under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the defendant's conduct. Finally, the ends of justice would <u>not</u> be served were the defendant to lose his long-term employment due to a felony conviction for an offense which occurred under circumstances such as the ones in this case, i.e., the victim was significantly involved in the provocation, the victim and the defendant were engaged in a mutual physical fight, and the defendant did not act intentionally or knowingly.

There is no proof contained in the record that the trial court considered the required factors for determining whether a defendant should be placed on judicial diversion. We acknowledge the trial court's finding that the defendant was having an affair with a married woman while a court order was in place that prohibited her from having contact with the defendant. However, we also recognize, as did the trial court, that the defendant was not under such court order and therefore, did not violate it. As such, we find the defendant's conduct does not outweigh the other positive factors in favor of granting judicial diversion or rise to the level of substantial evidence in support of the trial court's denial of judicial diversion. Considering all of the required criteria for determining the defendant's suitability for judicial diversion, we conclude that the trial court abused its discretion by denying the defendant's request for judicial diversion. Accordingly, the judgment of the trial court is reversed.

## CONCLUSION

Based upon our review of the record, we conclude that there is sufficient evidence to support the defendant's conviction for reckless aggravated assault. However, considering the appropriate factors for analyzing a defendant's request for judicial diversion, there is no substantial evidence to support the denial of judicial diversion. Therefore, the judgment of the trial court with respect to the issue of judicial diversion is reversed. Because we have determined that the defendant should be placed on judicial diversion, we need not address the issues raised by the defendant with regard to the sentence imposed. The judgment of the trial court is affirmed in part and reversed and remanded in part.

_____
JOHN EVERETT WILLIAMS, JUDGE